**Jeffrey M. Edelson**, OSB NO. 880407
JeffEdelson@markowitzherbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Ph:     (503) 295-3085
Fax:    (503) 323-9105

**Susan C. Stone**, (*pro hac vice pending*)
scs@kjk.com
**Kristina W. Supler**, (*pro hac vice pending*)
kws@kjk.com
KOHRMAN JACKSON & KRANTZ, LLP
1375 East 9th Street, 29th Floor
Cleveland, OH  44114
Ph:     (216) 696-8700

    Attorneys for Plaintiff John Doe

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **JOHN DOE**, | Case No. |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT** |
| **REED COLLEGE**, | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiff John Doe,[1] by and through counsel, for his Verified Complaint against Reed College, states as follows:

## INTRODUCTION

1. This action concerns the decision by Defendant Reed College ("Reed") to subject Plaintiff John Doe ("John") to an untimely and illegal disciplinary hearing related to an allegation of purported sexual misconduct.

2. Despite a federal requirement that colleges ensure the "prompt and equitable resolution" of grievance proceedings, Reed is acquiescing to an unwarranted demand by John's accuser, Jane Roe ("Jane"), that the school institute a formal Judicial Board hearing, even though nearly three years have elapsed since the alleged incident and Reed concluded its investigation roughly eleven months ago and decided not to impose any sanctions.

3. As more fully set forth in this Verified Complaint, at the request of Jane, Reed has agreed to conduct a disciplinary hearing to adjudicate Jane's allegation that John committed sexual misconduct on a day approximately 33 months ago.

4. The hearing is presently scheduled for 5:00 p.m. on Thursday, January 31, 2019.

5. Reed's Discriminatory Harassment and Sexual Misconduct Policy (the "Policy"), a copy of which is attached as Exhibit 1, grants complainants complete discretion on whether and when to elevate a "report" to the status of a "complaint" that must be adjudicated by a full Judicial Board hearing, regardless of how much time has elapsed since the complainant made a report or Reed completed its investigation, and regardless of whether Reed believes a hearing or sanctions are warranted.

---

[1] Simultaneous to the filing of this Verified Complaint, John Doe is filing a Motion to Proceed under Pseudonym in order to protect the identities of all students referenced in pleadings and exhibits.

6. Adhering to this Policy and absent injunctive relief, John will be subjected unnecessarily to a disciplinary hearing that violates Title IX of the Education Amendments Act of 1972 ("Title IX") and other federal regulations, and will cause John to suffer severe emotional distress.

## PARTIES

7. John is an undergraduate student in good standing at Reed and a resident of Ohio.

8. Reed is a private college with its principal place of business in Portland, Oregon.

9. Reed has the authority to grant the injunctive relief sought in this Verified Complaint.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

11. This Court has personal jurisdiction over Reed as it is domiciled in and/or conducts business in the State of Oregon.

12. This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

### Current State of Title IX Matters on Campus

14. On April 11, 2011, The United States Department of Education's ("DOE") Office of Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed how

universities must investigate and resolve complaints of sexual misconduct under Title IX. ("2011 Dear Colleague Letter" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).[2]

15. Universities are educational institutions designed to educate America's youth. They are ill-equipped to handle and adjudicate matters of sexual assault.

16. Despite forthcoming Title IX regulations that will be a significant departure from the 2011 Dear Colleague Letter, universities remain wary of bad publicity and continue to overreact given the possibility of federal investigations and sanctions, in addition to lawsuits.

17. As a result, colleges and universities have become quasi-criminal investigators and have institutionalized unfair procedures that lead to unreasonable punishments doled out to students accused of misconduct.

18. Reed is no exception.

19. Upon information and belief, Reed has engaged in a pattern and practice of violating accused students' rights due to these fears.

20. Reed has been the subject of unfavorable reports concerning sexual misconduct by its students:

   a. Reed was previously sued in this court regarding its handling of an allegation of sexual assault in *John Doe v. Reed Institute and Jane Roe*, CV 3:15-cv-00617-MO, (D. Or. 2015);

---

[2] The 2011 Dear Colleague Letter has been rescinded, and OCR issued a "new interim Q&A" for schools, *see* "Q&A on Campus Sexual Misconduct," https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, but schools continue to enforce the policies and procedures instituted in response to the 2011 Dear Colleague Letter.

b. *Students accused of sexual assault struggle to win gender bias lawsuits*, Inside Higher Ed (May 1, 2015), *available at* https://www.insidehighered.com/news/2015/05/01/students-accused-sexual-assault-struggle-win-gender-bias-lawsuits ("Reed College agreed with the female student's version of the events … and kicked the male student off campus. Now he's suing the college, alleging that Reed engaged in 'a series of arbitrary, discriminatory, and illegal actions' to ensure a predetermined outcome: his expulsion."); *id.* (stating that the plaintiff asserts that Reed ignored testimony that exonerated the accused);

c. *College Campus Sexual Assault*, New York Amsterdam News, *available at* http://amsterdamnews.com/news/2016/jun/23/college-campus-sexual-assault/ (June 23, 2016) (stating that Reed reported 12.9 reports of rape on its main campuses per 1,000 students.)

d. *Reed College ranks high in rate of reported sexual assaults on U.S. college campuses, study finds*, The Oregonian (June 7, 2016), *available at* https://www.oregonlive.com/portland/index.ssf/2016/06/reed_college_ranks_high_in_rep.html (noting that Reed had the highest rate of reported sexual assaults per capita among U.S. college campuses, reporting 18 sexual assaults in 2014, and that Reed "faced criticism in 2011, when students began speaking out against a highly secretive process for addressing sexual assaults.")

21. In light of concern about additional unfavorable media reports, Reed has engaged in gender bias and curtailed procedural protections afforded to accused male students like John in "sexual misconduct" cases.

22.     Indeed, Reed has turned its back on federal regulations mandating that a school's response to sexual harassment must be prompt. *See* 34 CFR § 668.46(k)(2)(i).

**Reed's Policies & Procedures**

23.     In accordance with directives from the Department of Education's Office for Civil Rights, Reed has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct.

24.     Reed designated Mike Brody as its Title IX Coordinator. In that role, Mr. Brody oversees and provides leadership for the activities related to Title IX compliance, training, investigations, enforcement, response and reporting.

25.     Additionally, Reed adopts and annually updates its Policy. *See* Exhibit 1.

26.     The Policy distinguishes between a "report," which notifies the college of a "perceived or actual violation," and a "complaint," which is a "report regarding perceived or actual violation(s) of College policy that results in a formal adjudication process by the appropriate Reed adjudicative Body." *Id.* at III.

27.     Reed's Policy allows a complainant who has made a report of sexual misconduct against a fellow student to elevate the matter to the status of a complaint "at any time." *Id.* at XIV, Secs. A & B.

28.     This elevation of a report to a complaint, which requires a formal Judicial Board hearing, can occur entirely at the discretion of the complainant, regardless of the outcome of Reed's investigation into the allegations in the report, regardless of whether Reed believes a hearing is warranted based on its investigation, regardless of whether Reed believes sanctions are warranted, and regardless of how much time has elapsed since the incident in question or the conclusion of the investigation. *Id.*

29. Reed's distinction between a report and a complaint contravenes legal directives for Title IX matters to be resolved promptly insofar as students can wait until the eve of graduation to elevate a report.

30. In addition, Section 3 of the Judicial Board Code of the Reed Guidebook states that "[a]ny current or former student(s) . . . may bring a complaint on behalf of themselves . . . to the Judicial Board or the Title IX Board for an apparent student violation of . . . College polices, rules, regulations or contracts." A copy of the Judicial Board Code is attached hereto as Exhibit 2.

## The Relationship between John and Jane

31. John and Jane began a consensual sexual relationship in September 2015, shortly after both arrived at Reed for their freshman year.

32. They ate most of their meals together, spent most of their nights together, and were physically intimate with each other on a nearly daily basis.

33. The relationship between John and Jane was intense and demanding, and they spent so much of their time together that John struggled to balance his school work with Jane's needs.

34. On April 22, 2016, seven months after they began dating, Jane went to a play without John, who was studying for an exam at the time.

35. Before the play, Jane consumed alcohol.

36. At some point, Jane texted John, asking him to meet up to get something to eat, even though Jane knew John wanted to stay home and study.

37. John met Jane and they proceeded to a fast-food restaurant where Jane ate a burger, fries, and drank a milkshake.

38. Reed dorm swipe card records indicate that John and Jane returned to Jane's dorm at 8:50 PM.

39. John, who did not drink that night, recalls spending several hours with Jane before engaging in sexual intercourse that night.

40. Jane later claimed the encounter occurred earlier in the evening, without consent, while John recalled the encounter as consensual and having occurred later in the evening.

41. John did not believe Jane was intoxicated at the time of sexual intercourse.

42. On April 23, 2016—the day after the alleged incident—Jane texted John, "Ty [*i.e.*, thank you] 4 spending da night."

43. John and Jane's relationship continued without any material changes throughout the remainder of spring semester 2016 and into the summer.

44. The couple continued to spend most of their time together, frequently having sexual intercourse and texting, speaking, and seeing each other every day for the remainder of the semester, even taking off-campus excursions and road trips that indicated an increase in intimacy and desire to spend time together.

45. Jane initiated much of the couple's sexual intercourse, as reflected by numerous text messages between Jane and John.[3]

46. During the summer, though separated by distance, John and Jane spoke daily and continued to text constantly. When Jane flew to John's parents' home, much of their time was spent engaging in consensual sexual intercourse.

47. When John took a semester off from Reed in the fall of 2016, Jane abruptly ended their relationship.

---

[3] Jane and John exchanged thousands of pages worth of text messages, both before and after April 22, 2016.

48. Notwithstanding the breakup, when John returned to Reed in early 2017, he and Jane spent significant amounts of time with each other.

49. In mid-February 2017, however, when John began dating another Reed student, Jane abruptly tweeted, "nothing quite like seeing ur r*pist first thing in the morning," shortly after John passed Jane's room on his way back from his new girlfriend's room.

50. In May 2017, when John changed his relationship status on Facebook to indicate he was in a relationship with the other student, Jane blocked him on social media.

**Jane's Allegations of Misconduct**

51. On August 10, 2017, almost sixteen months after the night of April 22, 2016, Jane filed a Title IX report with Reed alleging three instances of sexual assault by John in violation of the Policy: (1) non-consensual contact by John on April 22/23, 2016; (2) non-consensual contact by John on multiple occasions during July 2016; and (3) non-consensual contact on multiple occasions during the course of the relationship.

52. On August 14, 2017, Reed, through its Community Safety Director, Gary Granger, issued a no-contact directive to John, and clarified on August 25, 2017 that this directive was reciprocal and applied to both John and Jane.

53. On August 31, 2017, John also filed a report against Jane. He alleged that during their relationship, Jane engaged in numerous acts that violated the Policy, including sexual assault, harassment, teasing, manipulative treatment, and interfering with academic performance.

54. John submitted to Reed's Community Safety Director a report written by a clinical and forensic psychologist, which supported his claims against Jane. The psychological evaluation concluded in part that Jane was abusive of John.

### Reed's Investigations

55. On February 20, 2018, Reed issued a report finding sufficient evidence that John violated the Policy by engaging in non-consensual sexual intercourse during the April 22, 2016 encounter, but that he did not violate the Policy during the July 2016 period or on any of the numerous other occasions that John and Jane engaged in sexual intercourse.

56. On April 6, 2018, Reed issued a separate report finding sufficient evidence that Jane violated the Policy by subjecting John to "relationship abuse," but finding insufficient evidence to support John's other allegations.

### John's Appeal

57. On March 5, 2018, John appealed Reed's decision that there was sufficient evidence that he violated the Policy when he engaged in sexual intercourse with Jane on April 22/23, 2016. Reed concluded that Jane was incapable of consenting to sexual intercourse because she was incapacitated.

58. John argued that new evidence supported reversal of the finding. He explained that the investigator's efforts to determine Jane's blood alcohol content by using an online calculator were unscientific and speculative given the lack of evidence regarding how much wine Jane consumed, the percentage of alcohol content it contained, and the factual disputes about when the sexual contact occurred.

59. John further argued that the investigator was unqualified to render such an opinion, citing a pharmacologist's opinion that the calculation was not as simple as plugging numbers into an online calculator and that a blood alcohol content reading would not in any event necessarily indicate "serious impairment," which is a subjective term.

60. John further stated that the Reed's decision evidenced gender bias by: uncritically accepting all of the evidence Jane submitted as true; discounting evidence he submitted and impugning his credibility, even though he was sober on the night in question and was interviewed regarding the incident a year-and-a-half later; discrediting a polygraph examination he took voluntarily that corroborated his testimony; and discrediting the psychological evaluation of John, which indicated that his "intense desire to care for people and to be well regarded by others makes it very difficult to see him . . . harming a person he loved deeply by engaging in a sexually aggressive act . . . ."

61. John further noted that while Reed investigated Jane's report for over six months, interviewing numerous witnesses and producing a final document that exceeded one hundred pages, Reed's investigator gave short shrift to his allegations of serious abuse by Jane.

62. Even so, on April 13, 2018, John sent a letter to Jane, through Mr. Brody, asking that the dispute be resolved through informal resolution instead of prolonging the matter.

63. On April 16, 2018, Mr. Brody affirmed the finding that John was "responsible for initiating sexual contact without consent" in the April 22, 2016 incident because Jane was deemed "incapable of giving consent due to intoxication" and John "knew or should have known this" based on their interactions. Again, Reed found John's testimony about the timeline of events not credible and discounted the polygraph exam questions as insufficiently specific and inconsistent with Reed's policy.

64. On April 18, 2018, however, Reed decided "not to initiate a complaint" with the Judicial Board. Reed also did not impose any sanctions, other than maintaining the mutual no-contact order in place between John and Jane, and did not add the investigative file to John's student record.

65. On May 23, 2018 Reed also affirmed its finding that Jane engaged in "relationship abuse and bullying" of John, and re-affirmed the no-contact policy.

66. On June 6, 2018, John sent a letter to Mr. Brody. A copy of the letter is attached hereto as Exhibit 3. In his letter, John highlighted the disparity in the tone of Mr. Brody's written remarks to Jane, who was also found to have violated the Policy, as compared to his remarks to John, noting that Reed was far more sympathetic to Jane.

67. In the letter, John further articulated his concern that Reed's Policy did not bring any closure to the disciplinary process. Instead, John would have to continue to live with the fear, uncertainty, and anxiety that Jane could elevate her report to a complaint at any time while John was still a student at Reed, causing him to suffer "extreme anxiety" and to worry that, as he put it, "anything I do could trigger [Jane] to pursue additional disciplinary hearings." *Id*.

**Jane Escalates Matters and Demands a Formal Hearing**

68. Six months later, on November 28, 2018, Mr. Granger emailed John to state that Jane's attorney had notified Reed that Jane believed John was posting pictures on social media suggesting that they were in a dating relationship.

69. Mr. Granger informed John that this could be construed as violating the no contact order or enlisting someone else to violate the order.

70. John promptly responded on November 29, 2018, pointing out that the pictures were old pictures that were posted between May and July of 2016, while he and Jane were dating, well before Jane alleged any misconduct.

71. John noted that neither Jane nor anyone from Reed had ever asked him to remove the photos, but he agreed to remove them in any event.

72. Mr. Granger responded the same day to thank John and volunteered that based on John's response he did not believe any further action by Reed was required.

73. On December 10, 2018, more than two-and-a-half years after the April 22, 2016 incident, and roughly eleven months after Reed completed its investigation, Jane sent a letter to Reed requesting a Judicial Board hearing. A copy of the letter is attached hereto as Exhibit 4.

74. Reed did not notify John of Jane's request for a Judicial Board hearing until January 11, 2019.

75. On January 27, 2019, John learned that Reed scheduled the disciplinary hearing for Thursday, January 31, 2019.

76. That same day, Reed advised John that new evidence had been submitted for inclusion in the disciplinary proceeding, despite the fact that the evidence was nearly three years old and Reed's investigation concluded over one year ago.

77. In the entire time since Jane's report, John has fully complied with the no contact order and committed no disciplinary infractions whatsoever.

78. Other than a desire to harm John, there is no reason for Jane to seek a hearing since both Jane and John have co-existed on campus since the fall semester of 2017.

## CLAIM ONE

**(20 U.S.C. §§ 1681 *et seq.*)**

79. John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

80. Title IX provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

81. Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

82. Federal regulations implementing Title IX require universities to "adopt and publish grievance procedures providing for prompt and equitable resolution of student . . . complaints" of sexual assault. 34 C.F.R. § 106.8 and "a prompt, fair, and impartial process from the initial investigation to the final result[.]" 34 CFR § 668.46(k)(2)(i).

83. As a result, a "lengthy and unjustified delay" in a college's resolution of a grievance proceeding can constitute "deliberate indifference," or conduct that is "clearly unreasonable in light of the known circumstances." *See*, *e.g.*, *Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (citing *Davis v. Monroe County Bd. Of Educ.*, 526, U.S. 629, 641 (1999)); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003); *Williams v. Board of Regents of the College System of Georgia.*, 477 F.3d 1282, 1296-97 (11th Cir. 2007); *Cavalier v. Catholic College of America*, 306 F. Supp. 3d 9, 28, 31 (D.D.C. 2018); *Matter of Hall v Hofstra Univ.*, 2018 N.Y. Misc. LEXIS 1314, *35-41, 2018 NY Slip Op 50549(U), 11-13, 59 Misc. 3d 1214(A)(NY Sup. Ct. Nassau Cnty. 2018).

84. Reed's conduct, as described above, discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of Reed's policies and procedures in the wake of pressure from the OCR, complaints of females, and bad media publicity.

85. Reed's decision to proceed to a Judicial Board hearing regarding an unsubstantiated incident that occurred nearly three years earlier, roughly eleven months after concluding an investigation and deciding not to impose sanctions, solely at Jane's request, constitutes deliberate indifference as to John's Title IX rights to a prompt, equitable resolution of the allegation against him.

86. Reed has failed to remediate its discriminatory actions against John and holding a Judicial Board hearing will not only perpetuate the discrimination and indifference that John has already suffered but needlessly and unfairly subject him to risk of irreparable harm to his reputation, his future educational and economic prospects, and causing him emotional distress.

87. As a direct and proximate result of Reed's acts and omissions, as described throughout this Complaint, John has suffered damages in an amount to be determined at trial.

## CLAIM TWO

### (Intentional Infliction of Emotional Distress)

88. John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

89. Reed's conduct, as described above, was extreme, outrageous, and beyond the scope of common decency and intended to cause John severe emotional distress.

90. Reed intended to cause severe emotional distress to John by allowing Jane total discretion in whether to elevate the report about John's alleged misconduct from nearly three years ago to a formal complaint at any moment, even though Reed fully investigated the report approximately eleven months ago and decided not to impose sanctions against John or require a formal hearing.

91. This conduct constituted an extraordinary transgression of the bounds of socially tolerable conduct, especially given Reed's position of authority and control vis-à-vis John, which imposed a great obligation on Reed to refrain from subjecting him to chronic fear and distress about his reputation and future livelihood.

92. As a direct and proximate result of Reed's conduct, John has suffered severe emotional distress that no reasonable person should be expected to endure.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

**WHEREFORE,** John respectfully requests that this Court:

(A)  Award compensatory and punitive damages in an amount to be determined at trial;

(B)  Enter injunctive relief that terminates the student conduct matter and prevents the forthcoming Title IX/Judicial Board hearing regarding the complaint against John;

(C)  Issue a declaration that Reed's Policy is unlawful;

(D)  Award court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney fees; and

(E)  Award such other relief as this Court may deem just and proper.

Dated: January 28, 2019.

MARKOWITZ HERBOLD PC

*s/ Jeffrey M. Edelson*
Jeffrey M. Edelson, OSB No. 880407

KOHRMAN JACKSON & KRANTZ, LLP

*s/ Susan C. Stone*
Susan C. Stone
(*pro hac vice pending*)

*s/ Kristina W. Supler*
Kristina W. Supler
(*pro hac vice pending*)

830422.2

## VERIFICATION

I, ▬▬▬, being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint. I am the John Doe described in the Complaint. I believe that the disclosure of my identify will cause me irreparable harm as this case involves matters of utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, 34 CFR Part 99. All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.



Sworn to before me and subscribed in my presence this _28th_ day of January, 2019.

OFFICIAL STAMP
REBECCA ROBBINS ALBRIGHT
NOTARY PUBLIC-OREGON
COMMISSION NO. 981687
MY COMMISSION EXPIRES DECEMBER 02 2022

_Rebecca Robbins Albright_
NOTARY PUBLIC

STATE OF _Oregon_
COUNTY OF _Clackamas_
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _28_ DAY OF _January_
BY ▬▬▬
_Rebecca Robbins Albright_
NOTARY PUBLIC